## McVICKER v. MAY.

A father, the keeper of a public house, made a transfer on the 27th of March, of certain property, consisting chiefly of household furniture, to his son, then an inmate of the family, who gave his promissory note for the price thereof, agreeably to a valuation and inventory made at the time, in the presence of witnesses, a part of which was subsequently paid. After this transaction, the family lived together in the same way, until the 1st of April, then next, when they all removed to another public house, which the son opened in his own name, and stocked and kept on his own account; when the property embraced in the bill of sale was used by him indiscriminately with other goods bought by him from different persons. From the time the son opened the new public house, his mother and sister acted in the capacity of housekeepers for him, and his father was also employed in the house. *Held*, that a formal delivery, or ostensible change of possession, was not necessary to the validity of the sale.

These facts do not present such badges of legal or constructive fraud as would call upon this court to treat the transaction as a nullity; and the question of actual fraud was properly left to the jury.

It is not too much to infer from the facts in this case, that the goods were purchased with a view to the particular disposition made of them, and the want of a formal delivery at the sale, which might have been considered as an idle and suspicious ceremony, may thus be satisfactorily explained and accounted for.

ERROR to the Common Pleas of Bedford county.

*June* 13: The Commonwealth of Pennsylvania, for the use of George May, against John McVicker.—This was an action of debt on the official bond of the defendant, who was the sheriff of Bedford county. It was alleged that the sheriff had violated one of the conditions of his bond, in taking the goods of the plaintiff, on an execution against another. The evidence showed, that on the 27th of March, 1843, Joseph May, the keeper of a public house, made a transfer of all his household, bar, and kitchen furniture, to his son, George May, the plaintiff in this suit, who was then living with him. An inventory and valuation of the goods thus sold, was made in the presence of witnesses, for which the plaintiff gave his promissory notes. These notes were subsequently, in part, paid. After the transaction, Joseph May and family continued to live together in the usual way until the 1st of April, then next, when they removed together to another tavern-house, of which, from that time forward, the plaintiff took the entire management and responsibility. He opened it in his own name, had his name affixed to the sign, and stocked and kept it on his own account. He used the goods embraced in the bill of sale from his father, indiscriminately with other furniture purchased by him from different persons. From the time the plaintiff opened the new tavern, his mother and sister acted in the capacity of housekeepers for him, and his father did jobs in and, about the house. On the 20th of July, 1843, Joseph S. Morrison

obtained a judgment against Joseph May, which was entered of August Term, 1843. On this judgment, a writ of *fi. fa.* was issued, under which the sheriff seized and sold the property of the plaintiff, embracing not only the furniture bought from his father, the defendant in the execution, but that purchased by him from other persons, and also corn and potatoes, the products of a lot rented by the plaintiff, and then in his occupancy.

The defendant requested the court to instruct the jury as follows:

" 1. If the jury believe that the plaintiff and his father, Joseph May, after the sale of the property by the father to the son, lived together in the same family as they had before, till they all removed to the house rented by Joseph May from John Young; and that they still continued to live in the same way after they removed to that house, without any open, visible and notorious change of the possession of the property; the sale was fraudulent in law, against creditors, and the plaintiff cannot recover any damages for the goods sold by Joseph May to the plaintiff.

" 2. That if one of the objects of the sale, by Joseph May to the plaintiff, was to secure his property from his creditors, so that it might be made the means, in the hands of George May, to enable him to maintain and support his father and his family, the transaction was fraudulent, and void against creditors.

" 3. That if the jury believe, that the object of the sale of the property, by Joseph May to George May, was to enable him to support the family, as stated in the last point, and he was to be in fact the agent of his father, in transacting the business; then the plaintiff cannot recover any damages in this action for the sale of the property purchased by George May of other persons, after the alleged purchase from his father.

" 4. That if the defendants are responsible for any damages, for selling any part of the goods mentioned in the declaration; they are answerable for no more than such goods sold for at the sheriff's sale."

His honour, Judge BLACK, in charging the jury, said, in answer to the first point of defendant, that the law was as there stated, but that it was for the jury to say whether they did live together after the removal as they had done before. That, under the facts, he could not say that there was no change of possession, or that the transaction was a fraud in law.

The second point was answered in the affirmative.

In answer to the third and fourth points, his honour charged:

" The third proposition is true; and if such was the object of the

transaction between the father and son, it was clearly and unquestionably fraudulent. And if the son afterwards bought property of other persons either with the proceeds of the business, or any other way, as agent of his father, such property, so purchased, as well as that fraudulently bought from his father, was liable to be taken in satisfaction of his father's debts, and the defendant did no more than his duty in levying and selling it. It follows, that if you believe the facts supposed in this point to be true, you ought to find in favour of the defendant generally.

"On the whole, we cannot say that this transaction was a fraud in law; and must therefore submit it to you, to say, whether it was or was not tainted with actual fraud. If the business was contrived for the purpose of covering the goods from the creditors of Joseph May, so as to prevent them from selling it, you ought to give no damages for the property bought by the plaintiff from his father; and if this part of the business was fraudulent, it renders the whole case suspicious; certainly if the plaintiff was carrying on the tavern as the mere agent of his father, he ought not to have a verdict in this action for any thing at all.

"We answer the fourth point by saying that it is not law. If the plaintiff's property was taken by the defendant, contrary to law, and without right, he (the plaintiff) is entitled to be made whole; which he could not be, unless he recovered at least the value of the property."

To this charge, the defendant excepted. The jury found for the plaintiff; when the defendant took this writ of error, and assigned for error here, "that the court ought to have instructed the jury, that, under all the facts in the case, the transfer by the father to the son was a fraud in law."

*Barclay*, for plaintiff in error.—The continuing in possession is a fraud *per se*, and not merely evidence of fraud. 10 Serg. & Rawle, 419; 5 Serg. & Rawle, 287; 14 Serg. & Rawle, 214; 2 Whart. 302; 5 Whart. 545; 6 Whart. 53; Smith's Leading Cases, Law Lib. vol. 43, p. 52. There must be a *bonâ fide*, substantial change of possession; and that a concurrent possession is fraudulent. Hoffner *v*. Clark, 5 Whart. 545; Hoofsmith et al. *v*. Cope, 6 Whart. 53; Cunningham *v*. Neville, 10 Serg. & Rawle, 419, 428.

*Cox*, contrà.

*June* 22. PER CURIAM.—We see no such badges of legal or constructive fraud in this case, as would call on us to treat the transaction as a nullity; and the question of actual fraud was properly left

to the jury. The alleged defect in the sale is, that there was no formal delivery, or ostensible change in the possession. The case seems to be, that on the 27th of March, the father, then keeping a public house, made a bill of sale of the goods to the plaintiff, his son, and an inmate of the family, and received his promissory notes for the price of them, a part of which has been paid; and that the parties lived together in the same way till the 1st of April, when the son opened another tavern, stocked and kept by him on his own account, when the goods in question were used by him indiscriminately with others bought by him from different persons. It is not too much to infer from this, that they were purchased with a view to this particular destination; and the want of a formal delivery at the sale, which might have been considered as an idle and suspicious ceremony, may thus be satisfactorily explained and accounted for. It would have been of no practicable use to separate them from the father's other goods, and lock them up for the four intervening days, even if he had been provided with a place to keep them, when the want of such a measure could have given the father no appreciable degree of false credit with the public. A different construction would make a thing purchased from the father useless to the son, so long as he continued to inhabit the paternal mansion. When the son opened the new tavern, his mother and sister kept house for him, and his father did jobs; but the son's possession and use of the goods were exclusive. But if mere cohabitation were a badge of fraud, a father's sale to his unmarried son would seldom be sustained. It certainly was not necessary for the son to turn his father out of doors; and the direction seems to have been entirely proper.

Judgment affirmed.